**SOUTHERN ILLINOIS BUILDERS AS-SOCIATION, a Corporation, et al., Plaintiffs,**

v.

**Richard B. OGILVIE, Governor of Illinois, et al., Defendants.**

**Civ. No. 4748.**

United States District Court, S. D. Illinois, S. D.

May 7, 1971.

Amended Order June 2, 1971.

———◆———

Edward Neville, E. St. Louis, Ill., Shifrin, Treiman, Schermer & Gallop, J. Leonard Schermer and Lawrence Kaplan, St. Louis, Mo., for plaintiffs.

William J. Scott, Atty. Gen., State of Ill., James M. Winning, William P. Ryan, Sp. Asst. Atty. Gen., for Richard B. Ogilvie, Governor, State of Ill. and other state officers.

Gruenberg & Souders, Harold Gruenberg, St. Louis, Mo., for Labor Unions.

Edward L. Welch, East St. Louis, Ill., for Metro-East Labor Council.

James Razicho, Dept. of Justice, St. Louis, Mo., Donald B. Mackay, U. S. Atty., Springfield, Ill., for the United States.

## OPINION

POOS, Chief Judge.

This is an action for declaratory judgment brought by the Southern Illinois Builders Association and Southern Illinois Contractors Association (hereinafter referred to as S.I.B.A. and S.I.C.A. respectively). Jurisdiction is based upon the Labor Management Relations Act of 1947, Section 301 (29 U.S.C. Sec. 185), and Title VII of the Equal Employment Opportunities Act of 1964 (42 U.S.C. Sec. 2000e), and 28 U.S.C. Sec. 1331. All parties have stipulated as to the jurisdiction.

S.I.B.A. and S.I.C.A. are not-for-profit corporations duly organized and existing under the laws of the State of Illinois. S.I.B.A. is an organization whose members are contractors engaged in the building and construction industry in southern Illinois, including Madison and St. Clair Counties. The members of S.I.C.A. are also members of S.I.B.A., and are engaged in highway construction and reconstruction in southern Illinois, including Madison and St. Clair Counties.

The plaintiffs, (S.I.B.A. and S.I.C.A.) are employers engaged in commerce and in an industry affecting commerce within the meaning of 29 U.S.C., Sec. 152 and 185. The S.I.B.A. and S.I.C.A. also represent their members, who are employer contractors, and bargain for employer contractors who are also employers engaged in an industry affecting commerce within the meaning of 42 U.S.C., Sec. 2000e et seq. S.I.B.A. and S.I.C.A. have been, in the past and at the present time are representing their member employer contractors for all purposes with respect to all equal opportunity laws, orders and regulations.

Plaintiff S.I.B.A., on behalf of its members who have assigned their bargaining rights to it, including all of its members who constitute the membership of S.I.C.A., bargained and entered into a labor agreement with the International Association of Bridge, Structural and Ornamental Ironworkers, Local No. 392, AFL–CIO (hereinafter Ironworkers Local 392), on or about August 1, 1969.

Plaintiff, S.I.C.A., on behalf of its members who have assigned their bargaining rights to it, bargained and entered into labor agreements with the Operative Plasterers and Cement Masons International Associations, Local No. 90, (hereinafter Cement Masons Local 90), on or about August 1, 1969, and the International Union of Operating Engineers Local 520) on or about March 23, 1970; all of the hereinabove labor unions are labor organizations within the meaning of 29 U.S.C., Sec. 152 and Sec. 185, and 42 U.S.C. 2000e et seq.

Metro-East Labor Council, Inc. is an organization composed of representatives of the black community in Madison and St. Clair Counties and has represented that community in matters involving equal employment opportunities in the construction industry.

The plaintiffs named the Ironworkers Local 392, Cement Masons Local 90, Operating Engineers Local 520, the Metro-East Labor Council, Inc., as defendants,

in addition to the following State officials:

Richard B. Ogilvie, Governor

William F. Cellini, Director, Department of Public Works and Buildings,

Richard H. Golterman, Chief Highway Engineer, Division of Highways, Department of Public Works and Buildings,

Robert E. Kronst, District Engineer, District No. 8, Division of Highways, Department of Buildings & Public Works.

The United States, upon motion duly filed, over the objection of the defendant unions, was granted leave to intervene in this action pursuant to Rule 24, Federal Rules of Civil Procedure.

In July 1968, the United States Department of Transportation instituted a freeze on the letting of new contracts for federally assisted highway construction in Madison and St. Clair Counties because of high costs and a determination that equal employment opportunities did not exist for blacks, as was required by Executive Order 11246.

The following statistics adequately portray the inequality of minority representation in the highway construction industry with respect to the defendant unions.

In December 1968, Operating Engineers Local 520 had approximately 1124 members in construction work, none of whom were black. In October 1969, Local 520 had 1738 members, of whom 18 were black. Local 520 has no training program for members. However, unskilled persons frequently began working in the oiler classification and received informal on-the-job training leading to qualification for employment as operating engineers. There is nothing in the record to suggest that at least as of December 1968, blacks had ever received informal on-the-job training with respect to construction work through Local 520.

In December 1968, Cement Masons Local 90 had approximately 278 members of whom one was black. The Local 90 apprenticeship program at that time had 14 indentured apprentices, all of whom were white, and no black had ever completed the apprenticeship program. Local 90 began its apprenticeship program in 1964. Prior to that time unskilled persons entered the trade by receiving informal on-the-job training. In October 1969, Local 90 had 280 members of whom three were black.

In December 1968, Ironworkers Local 392 had approximately 480 journeyman members, all of whom were white. The Local 392 apprenticeship program had at that time approximately 23 apprentices, all of whom were white, and no black had ever completed the apprenticeship program. In November 1969 Local 392 had 509 members, of whom three were black.

Subsequent to the imposition of the freeze, federal officials from the Department of Transportation, Labor and Justice, along with officials from the State of Illinois, representatives of the S.I. B.A., representatives from six labor organizations having jurisdiction in the said two-county area, (The Teamsters, Laborers, Carpenters, Cement Masons, Ironworkers, and Operating Engineers), and representatives of the black community in the two-county area met on numerous occasions for the purpose of resolving the problems by way of an affirmative action plan relating to equal employment opportunities for minority group persons seeking thereby to alleviate the freeze.

The State of Illinois became active as a party to the negotiations sometime after August 1968. At that time the Congress of the United States passed the Federal Aid Highway Act which requires States which receive federal funds for highway construction to certify to the Federal Government that there exist training programs in the trades involved in highway construction sufficient to provide equal employment opportunity for minority groups. As a result of this mandate by Congress, and at the request of the parties, the State of Illinois began assisting in the development of a training program so that federal highway con-

struction in the two-county area could resume.

In drafting a plan to satisfy federal law, the State received information from S.I.B.A., the State agencies, Federal agencies, and the black community. The unions were requested to give information relating to the statistics by race of their membership and apprenticeship classes, but refused to cooperate.

The United States filed suits against each of the defendant unions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. in the United States District Court for the Eastern District of Illinois, alleging a pattern and practice of racial discrimination, including inter alia an allegation that the defendants' unions failed and refused to take reasonable and adequate steps to eliminate the effects of racially discriminatory policies and practices. The United States sought relief enjoining the unions from hindering or discouraging the contractors from meeting their contractual obligations imposed on the contractors under Executive Order 11246. The suits against the Operators and Cement Masons were filed on January 17, 1969, Civil Nos. 69-9 and 69-11. The suit against the Ironworkers was filed on June 2, 1970, Civil No. 70-78. As a result of this action, consent decrees were entered into by each of the respective parties in the United States District Court for the Eastern District of Illinois.

In January, 1970, a first draft of "An Agreement to Facilitate Equal Employment Opportunities in State Highway Construction in Madison and St. Clair Counties", (hereinafter Ogilvie Plan) was presented to all interested parties by the State of Illinois. Suggestions were made by the parties and changes were made. Prior to the execution of the Ogilvie Plan, the unions refused to sign the plan. The Plan was then modified to provide for two-party (S.I.B.A. and Metro-East) agreement, with an addendum for unions who wished to participate in the Plan. The S.I.B.A. and the Metro-East Labor Council signed the agreement with his signature on June 3, 1970. In addition, Teamster Locals 525 and 729 signed the addendum to the Plan, thereby agreeing with the provisions of the Plan.

After the execution of the Ogilvie Plan by the S.I.B.A. and the Metro-East Labor Council, the State of Illinois highway construction and reconstruction and all federally assisted highway construction resumed in the two-county area by order of the Department of Transportation. Following the resumption of work, the State of Illinois incorporated the Ogilvie Plan by reference into all bids for construction and reconstruction of highways in the two-county area.

Subsequent thereto disputes arose among S.I.B.A. defendant unions, State officials, and Metro East Labor Council, Inc., and as a result the Ogilvie Plan was not properly implemented. As a result of this failure, four highway construction jobs in Madison and St. Clair Counties were shut down on or about January 22, 1971, by State officials for noncompliance with the provisions of the construction contracts relating to the Ogilvie Plan; other highway construction jobs in Madison and St. Clair Counties were not shut down on said date. The value of the jobs that were shut down exceeds ten thousand dollars.

 The declaratory judgment action was thereafter filed jointly by S.I.B.A., and S.I.C.A. on January 29, 1971, seeking a determination as to the constitutionality of the Ogilvie Plan and a declaration of rights and duties of plaintiffs and each of defendants with respect to the collective bargaining agreements, consent decrees, and the Ogilvie Plan.[1]

1. The defendant unions filed a cross-claim making application for injunctive relief to be heard and determined by a district court of three judges pursuant to Title 28, U.S.C., Sections 2281 and 2284. The application is denied since no state statute or regulation promulgated pursuant to a state statute is attacked as unconstitutional as required by Section 2281, nor is the agreement here

## I.

The minority group representation in the highway construction industry in Madison and St. Clair Counties is grossly underrepresented. This is due to the fact that equal employment opportunities do not exist for the minority groups in this two-county area in the construction unions. The construction unions have traditionally reserved their membership to a select group of individuals who have been fortunate enough to have some connection with a specific union. The contractors rely upon the union referral system as a source for its employees, and as a result of this union referral system, the unions have been able to perpetuate their discriminatory practices.

■ There is no doubt that there is a need to eradicate these past evil effects, and to prevent the continuation in the future of these discriminatory practices. Inasmuch as such practices have continued for decades, there is no infallible and certain formula which will erase decades of history and alter a distasteful set of circumstances into a utopian atmosphere. Discriminatory practices have taken place, and something must be done in order to rectify the situation. Such practices must be eliminated by responsible and responsive governmental agencies acting pursuant to the best interests of the community. Basic self-interests of the individual must be balanced with social interests, and in circumstances where blacks have been discriminated against for years, there is no alternative but to require that certain minorities be taken into consideration with respect to the specific minority percentage of the population in a given area in order to provide a starting point for equal employment opportunities. In this regard, it is the feeling of this Court that minimum ratios, where, de jure or de facto, based upon race are constitutional and valid when adopted for the purpose of implementing affirmative action to achieve equal employment opportunities.

If blacks are to enter and remain within the mainstream of American life they must have an equal opportunity along with whites. Sufficient strides toward equality are being made in the field of education even though at a very slow pace. However, the employment field, particularly the construction unions, have not taken even the smallest stride toward equal employment opportunities.

The Ogilvie Plan is a realistic plan which realistically promises to work immediately. It provides a starting point by assuring that certain minorities are provided an equal employment opportunity.

The Ogilvie Plan is designed to attract minority group persons residing in Madison and St. Clair Counties for training in the six major trades (Ironworkers, Cement Masons, Operating Engineers, Laborers, Carpenters and Teamsters) in-

---

involved of general and statewide application. See Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1966) and Landry v. Daley, 280 F.Supp. 929 (N.D.Ill.1967).

The State of Illinois filed a Motion to Dismiss on February 19, 1971 upon the authority of Schwing v. Miles, 367 Ill. 436, 11 N.E.2d 944, and People ex rel. v. Dunne, 258 Ill. 441, 101 N.E. 560. While it may be that the State cannot be compelled to let contracts on specific terms and conditions, the Court does have jurisdiction with respect to State officials in so far as the constitutionality and lawfulness of the Plan are brought into issue. See Contractors Association of Eastern Penna. v. Shultz, Secretary

of Labor, 442 F.2d 159 (3rd Cir., 1971). See also Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681. Accordingly, the motion is denied.

The Metro East Labor Council's counterclaim requesting inter alia that this Court order a trusteeship over the defendant unions, is denied at this time. There is no showing in the present record that the unions will not comply with the Plan or other programs designed to provide equal employment opportunities to blacks once the lawfulness of the Plan has been declared. Metro East Labor Council's Motion to Dismiss the Complaint is also denied.

volved in highway construction. The purpose of the Plan, as stated in the Plan itself, is "to bring about the implementation of equal employment opportunities in the counties of Madison and St. Clair." To accomplish this purpose the Plan provides for the recruitment, testing, training and placement of unemployed minority group residents of the two-county area in federally aided highway construction. The program is available to all, without regard to race or color, despite the fact that all of the trainees thus far have been black.

Generally the Plan provides for an initial period of training of a classroom and practical nature for the training of a specified period ranging from four to twelve weeks, depending upon the craft. The initial training program is given for the purpose of providing the trainee with the rudimentary elements of the craft. Thereafter depending on the skills acquired by the trainee, he is given appropriate on-the-job training to develop his skills to the level of a fully qualified and competent journeyman. In order to provide this kind of training, the contractors are required, under the terms of the agreement, to hire trainees at the minimum rate of one trainee for every four journeymen. Under the Plan an advanced trainee will achieve journeyman status upon a maximum of 200 trainee-work days, depending on the skill and ability of each individual trainee.

## II.

◼ Defendant unions claim that the Ogilvie Plan violates the Civil Rights Act of 1964 (42 U.S.C. 2000 et seq), and the Fifth and Fourteenth Amendments to the United States Constitution.

The Plan here under attack is the State's implementation of Executive Order No. 11246 and Section 22(a) of the Federal Aid Highway Act of 1968. Under the Executive Order the Secretary of Labor, or the federal contracting agency in accordance with the rules, regulations and orders issued by the Secretary of Labor, may impose various sanctions on contractors who fail to comply with their contractual commitments. These sanctions include the cancellation, suspension or termination of contracts and the debarment of a contractor from further Government contracts. Section 22 (a) of the Federal Aid Highway Act of 1968 requires a State which receives federal funds for highway construction to certify to the Federal Government that there exist training programs in the trades involved in highway construction sufficient to provide equal employment opportunity for minority groups. These federal orders require that contractors take affirmative action in recruiting, training and hiring of minority group persons to insure no discrimination exists in contracts involving public funds.

The Ogilvie Plan's foundation lies in Presidential Executive Order No. 11246, and the Government's right to fix the terms and conditions upon which it contracts.

The validity of the Executive Order has been upheld by the Courts, most recently by the Court of Appeals for the Third Circuit in Contractors Association of Eastern Penna. v. Secretary of Labor, supra, affirming 311 F.Supp. 1002 (E.D.Pa., 1970).[2] See also Farmer v.

---

**2.** Executive Order 11246 is the most recent of six Presidential orders. A summary of the history of these orders appears in Farmer v. Philadelphia Electric Company, 329 F.2d 3, 5–7 (3rd Cir. 1964). In 1961 President Kennedy issued E.O. 10925 (26 F.R. 1977, March 6, 1961) which set forth sanctions and penalties to be imposed on contractors who failed to meet the non-discrimination requirements of the Order.

In 1963, President Kennedy issued Executive Order 11114 (28 F.R. 6485, June 22, 1963) requiring that the non-discrimination clause be included in all federally assisted construction contracts. Executive Order 11114 makes the finding that construction under programs of federal grants, loans and other forms of federal assistance "creates substantial employment opportunities; and declares the policy that 'employment opportuni-

Philadelphia Electric Co., 329 F.2d 3 (3rd Cir. 1964); Farkas v. Texas Instrument Co., Inc., 375 F.2d 629 (5th Cir. 1967); and Local 189, United Papermakers and Paperworkers, A.F.L.–C.I.O., C.L.C. v. United States, 416 F.2d 980 (5th Cir. 1969), certiorari denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108.

■ The contractors may find themselves in a rather unfortunate position, but unless prohibited by statute the Government has the unrestricted power to determine with whom it will deal and the terms and conditions of its contracts. Perkins v. Lukens Steel Company, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108; King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118. (1969). Such terms and conditions can be required despite conflicting terms and conditions of collective bargaining agreements that a contractor may have with a union(s). It is a settled principle of law that:

> Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases. * * * It was not intended to be a bestowal of litigable rights upon those desirous of selling to the Government; it is a self-imposed restraint for violation of which the Government—but not private litigants —can complain. Perkins v. Lukens Steel Company, supra, 310 U.S. at p. 127, 60 S.Ct. at p. 876.

As part of the terms and conditions of a contract, contractors who perform work on federal assisted projects must adopt affirmative action programs designed to guarantee equal employment opportunities for members of minority groups. If the Government has developed the Plan, as here, the contractor who is performing work pursuant to a contract where public money is involved, is bound by the terms and conditions of the affirmative action program.

Under the Plan, which is a term and condition of federal assisted highway construction contracts in the two-county area, contractors are required to take minority group representation into account in their recruiting and hiring practices. Such consideration is in conformity with the law as stated in Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2nd Cir. 1968):

> What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, and to the extent it is necessary to avoid unequal treatment by race, it will be required.

See also: Youngblood v. Board of Public Instruction of Bay County Florida, 430 F.2d 625 (5th Cir., 1970); Offermann v. Nitkowski, 378 F.2d 22 (2nd Cir. 1967); United States v. Jefferson County Board of Education, 372 F.2d 836, 876 (5th Cir. 1966), aff'd on rehearing, 380 F.2d 385 (5th Cir. 1967) (en banc), certiorari denied, sub nom.; Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L. Ed.2d 103.

In its recent decision Contractors Association of Eastern Penna. v. Secretary of Labor, supra, the Court of Appeals for the Third Circuit upheld the District Court's decision and denied many of the same arguments presented by the contractors and unions in this case concern-

---

ties created by federal funds shall be equally available to all qualified persons.' "

Executive Order 11246, presently in effect, combined the provisions of E.O. 10925 and E.O. 11114 into a single order and transferred responsibility for its im-

plementation to the Secretary of Labor who is authorized to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof." (Sec. 201).

ing the constitutionality and legality of such affirmative action programs. The Plan, there in issue, covered six construction trades in a five-county Philadelphia area; the construction industry as a whole in the area had a black make-up of 30 per cent, while in the trades involved in the Plan, blacks made up approximately one per cent. Accordingly, the Department of Labor determined that special measures were necessary to provide equal employment opportunity in the six trades in accordance with the requirements of Executive Order 11246. Therefore, the Department of Labor established the Philadelphia Plan which stated ranges of minority group employment goals for four years; the ranges varied between 4–9 percent representation the first year, and from 19–26 per cent during the fourth year. These ranges were based primarily on findings concerning the availability of minority group persons for employment and the impact of such a program on the existing labor force.

The Department of Labor determined that a contractor could commit himself to the employment goals "without adverse impact on the existing labor force." Furthermore, since the number of minority group persons available for employment in the six crafts could not be specifically determined, the contractors are given an opportunity to demonstrate that they made every good faith effort to meet their commitment before action is taken against them. However, for the purpose of determining whether the contractor is in compliance, "it is no excuse that the union with which the contractor has a collective bargaining agreement failed to refer minority employees."

The District Court upheld the Plan against objections that the Plan violated the Fifth and Fourteenth Amendments, Civil Rights Act of 1964, and the National Labor Relations Act. The Court of Appeals for the Third Circuit stated that the Philadelphia Plan is "clearly" color conscious but held in the face of the contractors' objections based on the Civil Rights Act of 1964 that "to read (The Civil Rights Act) in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history." 442 F.2d p. 173. The Court similarly rejected the contractors' constitutional argument against the Plan. See also Joyce v. McCrane, 320 F.Supp. 1284 (D.C.N.J., 1970) upholding the Newark Plan; Weiner v. Cuyahoga Community College District, 15 Ohio Misc. 289, 238 N.E.2d 839, aff'd 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), certiorari denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970).

In light of the above decisions, this Court finds little difficulty in approving the Ogilvie Plan.

■ Inasmuch as this Court has determined that the Ogilvie Plan is valid and constitutional, it should next be determined whether or not the contractors are required to cooperate with the Ogilvie Plan. The Ogilvie Plan was developed pursuant to Executive Order 11246 and Section 22(a) of the Federal Aid Highway Act. The Executive Order and its predecessors have the full force and effect of law. The Contractors Association of Eastern Penna. v. Schultz, Secretary of Labor, supra, 442 F.2d pp. 166–171. See also Farkas v. Texas Instrument Co., 375 F.2d 629 (5th Cir. 1967); Farmer v. Philadelphia Electric Co., 329 F.2d 3 (3rd Cir. 1964). The contractors, through their agent, S.I.B.A., are signatories to the Ogilvie Plan. It necessarily follows that any contractor who wishes to contract for highway construction in the two-county area must bind himself to comply with the Plan whether signatory or not. See Contractors Association of Eastern Penna. v. Secretary of Labor, supra, and Perkins v. Lukens Steel Company, supra. As the parties have stipulated, the S.I.B.A. was authorized to act for the contractors in signing the Plan. The Plan being lawful the

contractors, in signing it, are duty bound by it.

■ Defendant unions have also raised a number of objections to the Ogilvie Plan, based in large part upon alleged conflicts between the provisions of the Plan, the consent decrees, and the collective bargaining agreements between the unions and contractors.

The objections must fail, in view of the provisions in each of the consent decrees with the United States which provide for cooperation with the training plans such as the Ogilvie Plan, and the provisions in two of the consent decrees, those with the Ironworkers and the Cement Masons, which specifically provide that trainees may be requested by contractors and referred out of order. Nothing in either of those decrees are in conflict with the provisions of the Ogilvie Plan. The Operators Engineers Local 520 decree imposed upon that Local a temporary obligation to modify its referral for employment procedures to the extent of creating a totally separate and distinct supplemental referral list for trainees in the limited geographical area of East St. Louis, Illinois, and its immediate environs. The requirement that this supplemental list be maintained expired under the terms of the decree on September 1, 1970. Since that time, even though Local 520 has continued to maintain a supplemental list, there is no requirement in the decree which is inconsistent with the provisions of the Ogilvie Plan. The Operators' decree was fashioned before the Ogilvie Plan was developed, and as a result is less specific than the other decree, but it does provide for cooperation with any such training program, including on-the-job training. Since the essence of any on-the-job training program is referral for work, the decree cannot be taken as requiring the union not to refer trainees in such a manner as would allow the contractors to comply with the Plan, since such a reading would require the Union in effect to *not* cooperate with the Plan. Thus the consent decrees require the unions to cooperate with the contractors in complying with the referral provisions of the Plan, and, indeed, require the unions to cooperate with the Plan.

Upon finding that a requirement is a lawful and proper exercise of authority under the Executive Order and Section 22(a) of the Federal Highway Act (as has been shown the Ogilvie Plan to be), there is no question that all contractors who wish to contract for highway construction in these two counties must meet these requirements, and that the S.I.B.A., as representative of its member contractors, has bound its members, by signing the Plan, to comply with the provisions of the Ogilvie Plan.

■ The existence of collective bargaining agreements which contain provisions in conflict with some provisions of the Ogilvie Plan is no defense to noncompliance with the Plan's provisions by the contractors. See Contractors Association of Eastern Penna. v. Schultz, Secretary of Labor, supra. 442 F.2d p. 175; United States v. Sheet Metal Workers, Intern. Ass'n, Local Union No. 36, A.F. L.–CIO., 416 F.2d 123, 132 n. 16 (8th Cir. 1969).

To hold that the existing obligations under the collective bargaining agreement constitute a valid defense would readily subvert attempts by the Government to regulate the terms under which it will contract. It is a well settled principle that "immunity from federal regulation is not gained through forehanded contracts." Federal Housing Authority v. Darlington, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958); Fleming v. Rhodes, 331 U.S. 100, 107, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947).

The remaining conflicts relate to trainee wage rates and grievance procedures. The latter conflict, in reality, does not exist as unions which sign the addendum to the Plan are not required to follow the Plan's grievance procedure. Any disputes between the contractors and the unions (as distinguished from disputes among signatories to the Plan) therefore may continue to follow the procedures in their collective bargaining

agreements. Likewise, with regard to wage rates, the difficulty is more apparent than real, since wage rates do not appear to have been a stumbling block thus far. In the apprenticible trades there appears to be no reason under the collective bargaining agreements why the trainees who are not yet fully qualified journeymen cannot be treated (for pay purposes) as first, second or third year apprentices. With respect to the Operating Engineers I do not read the Plan as precluding payment to trainees at full Oiler rates (since oilers typically are learners in the industry), which are comparable to apprenticeship rates in the other trades.

In conclusion, the Ogilvie Plan represents an equitable solution to the problem of equal employment opportunity for minority group persons in the two-county area, and such plans are well established by federal law.

It is therefore ordered, adjudged and decreed that:

(1) Defendant Unions' Counterclaim be denied.

(2) Defendant Unions' Crossclaim be denied.

(3) Defendant Metro-East Labor Council's Counterclaim be denied.

(4) Defendant Metro-East Labor Council's Motion to Dismiss the Complaint be denied.

(5) Defendant State Officials' Motion tion Dismiss the defendant unions' nied.

(6) Defendant State Officials' Motion Dismiss the defendant unions' crossclaims be allowed, inasmuch as this Court has heretofore denied defendant unions' crossclaims.

### AMENDED ORDER

This cause came on for hearing on the motion to vacate orders and declaratory judgment, on a motion for new trial on behalf of defendant Unions, on a motion to amend the judgment by plaintiff S.I.B.A. and S.I.C.A., and on a conditional motion for a new trial by defendant Metro-East Labor Council.

This Court had anticipated that in its determination of the constitutionality of the Ogilvie Plan, the parties involved herein would meet and attempt to implement the Ogilvie Plan in a most expedient manner possible. Inasmuch as the parties herein have failed to reach any agreement among themselves as to certain specific areas in facilitating the implementation of the Ogilvie Plan, this Court shall assume the duty of clarifying these specific areas.

It is therefore ordered, adjudged and decreed:

(1) The orders entered by this Court this date are made a part of the Order and Decree entered by this Court on May 7, 1971, thereby amending said Order and Decree.

(2) The sequential hiring pattern of trainees or minority group individuals in the Kronst memorandum of January 12, 1971 is not prohibited nor required by the Ogilvie Plan.

(3) The intent of the Ogilvie Plan in establishing its minimum ratios is to require referral and employment of minority group individuals on a craftwide basis in highway construction, in the aggregate, throughout the jurisdictional area covered by the Ogilvie Plan, and not to require referral employment of minority group individuals in a fixed ratio on any particular job site.

(4) The terms and provisions of the Ogilvie Plan do not require the contractors to employ more individuals than are needed to perform any job according to the terms of the collective bargaining agreements between the unions and the contractors.

It is further ordered, adjudged and decreed that:

(1) The Conditional Motion for a New Trial of Metro-East Labor Council be denied.

(2) The Motion for New Trial and the Motion for Vacation of Orders and Declaratory Judgment by defendant Unions be denied.

(3) The Motion to Amend the Declaratory Judgment by the plaintiff Contractors, S.I.B.A. and S.I.C.A., be granted in part and denied in part.