Eugene **FARMER**, Appellant,

v.

**PHILADELPHIA ELECTRIC COMPANY.**

No. 14460.

United States Court of Appeals Third Circuit.

Argued Nov. 21, 1963.

Decided March 12, 1964.

Rehearing Denied April 8, 1964.

**4**

Norman Shigon, Philadelphia, Pa., for appellant.

Thomas A. Masterson, Philadelphia, Pa. (Vincent P. McDevitt, Eugene J. Bradley, Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and GANEY, Circuit Judges.

GANEY, Circuit Judge.

This is an appeal from an order of the District Court dismissing the complaint. Since diversity of citizenship of the parties does not exist here, the threshold question is whether that court had jurisdiction under 28 U.S.C.A. § 1331(a).[1] The case appears to be the first of its kind in the Federal courts.

In substance the complaint, filed September 13, 1962, makes the following averments: By an Executive Order, duly issued pursuant to the Constitution and enabling legislation of Congress, and by rules and regulations concerning procurement duly promulgated by the General Services Administration, it is provided that all government contracts shall

1. This section provides: "(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

The Act of March 3, 1875, § 1, 18 Stat. 470, was the first statute conferring jurisdiction on the federal courts in cases involving a "federal question". The wording of that statute has been substantially preserved in the present Act. See Wright, Federal Courts (Handbook Series, 1963), § 17.

contain a provision setting forth that "in the performance of the work under the contract, the contractor will not discriminate against any employee during employment \* \* \* because of race, creed, color, or national origin \* \* \*." Since 1951, the defendant entered into certain contracts containing a nondiscrimination clause with the United States. In November of 1954, plaintiff was injured while working as a lineman for the defendant. The latter, after assigning him to light work duty for awhile in accordance with its prior announced policy, ordered him to return to lineman duty although he was physically unable to perform that type of work. When he declined to report to work as a lineman, the defendant terminated his employment on August 18, 1958. Paragraph 13 of the complaint states:

> "13. Defendant has failed and neglected to perform the condition of the said contract with the United States of America in that it has discriminated against the plaintiff because of his race and color in refusing to place plaintiff upon light duty status while it has tendered such permanent status to employees of white color or of the Caucasian race."

Claiming a federal right as a third-party beneficiary of certain contracts between the United States and defendant, he demands compensatory and punitive damages from defendant for physical and emotional injury, loss of job opportunity, loss of constitutional rights and of his natural rights as a human being, as a result of defendant's discriminatory action.

The first Executive Order that we could find requiring contracting agencies of the Government to use a nondiscrimination provision in contracts was No. 8802 issued by Franklin D. Roosevelt on June 25, 1941, 6 F.R. 3109 (June 1941) U.S.Code Cong.Service 1941, p. 860. This Order announced the policy of the Government to encourage full participation in the national defense program by all citizens of the United States, regardless of race, creed, color, or national origin.

It ordered "All contracting agencies of the Government of the United States shall include in all defense contracts hereafter negotiated by them a provision obligating the contractor not to discriminate against any worker because of race, creed, color, or national origin; \* \* \*." The Order also set up in The Office of Production Management a Committee of Fair Employment Practices whose function was to receive and investigate complaints of discrimination in violation of the provisions of the Order and take appropriate steps to redress grievances which it found to be valid, and make recommendations to the President and to Government agencies measures deemed necessary by it to effectuate the provisions of the Order. Executive Order 8802 was amended on May 27, 1943, by Executive Order 9346, 8 F.R. 7183 (May 1943) U.S.Code Cong.Service 1943, p. 5.46. This Order reaffirmed the policies of its predecessor and created a new Committee on Fair Employment Practices in the Office of Emergency Management with the power to promulgate rules and regulations and conduct hearings. It required all Governmental contracting agencies to include in contracts thereafter negotiated or renegotiated a provision obligating the contractor not to discriminate against any employee or applicant for employment because of race, creed, color or national origin. At the end of World War II, the Committee's existence was terminated.

In order to improve the means for obtaining compliance with the nondiscrimination provisions in Government contracts, Harry S. Truman, on December 3, 1951, signed Executive Order 10308, 16 F.R. 12,303 (December 1951), 3 CFR, 1949–1953 Comp., 837, U.S.Code Cong. & Adm.Service 1951, p. 1149. This Order made the head of each contracting agency of the Government primarily responsible for obtaining compliance with the nondiscrimination provisions of the contract and required him to take appropriate measures to bring about compliance. It also established the Committee on Government Contract Compliance to make

recommendations with a view toward the prevention and elimination of discrimination.[2]

On August 13, 1953, Dwight D. Eisenhower issued Executive Order 10479, 18 F.R. 4899 (August 1953), 3 CFR, 1949–1953 Comp., 961, U.S.Code Cong. and Adm.News 1953, p. 1043. This Order continued the policy of the previous one by imposing upon the head of each contracting agency the primary duty of obtaining compliance with the nondiscrimination provisions and required each agency to set up a procedure for the investigation of complaints and report to the Committee the action taken with respect to all complaints made or referred to it. It replaced the Committee on Government Contract Compliance with the Government Contract Committee and gave it authority to make recommendations to the President and the contracting agencies, and to receive complaints of alleged violations and transmit them to the appropriate agencies in accordance with agency procedure for handling such complaints. By Executive Order 10557, approved on September 3, 1954, 19 F.R. 5655 (September 1954), 3 CFR, 1954–1958 Comp., 203, U.S.Code Cong. and Adm. News 1954, p. 1859, the contracting agencies were required to include in Government contracts provisions recommended by the Committee on Government Contracts.[3] With exceptions not relevant here most Government contracts made during the effective period of this Order contained the nondiscrimination provision set forth therein.

Executive Order 10925, signed by John F. Kennedy on March 6, 1961, 26 F.R. 1977 (March 1961), 3 CFR, 1961 Supp., 86, abolished the Government Contract Committee, established the President's Committee on Equal Employment Opportunity, and greatly expanded the nondiscrimination provisions which are to be included in most government contracts entered into after the effective date of the Order.[4] The latter requires the Committee to adopt such rules and regulations and issue such orders as it deems necessary and appropriate to achieve the purpose of the Order, and empowers it to receive and cause to be investigated complaints by employees and prospective employees alleging discrimination contrary to the contract provisions of the clause. It spells out, for the first time, sanctions and penalties and the conditions under which they are to be imposed by the Committee or appropriate contracting agency upon contractors who have failed to comply with the provisions of the Order; and it also provides for the issuance of a certificate of merit to employers engaging in work under Government contracts if their practices conform to the purposes of the Order. It continues the policy of holding the contracting agencies primarily responsible for obtaining compliance by the contractor pursuant to the terms of the Order and the rules and regulations and orders of the Committee.

Regulations concerning the nondiscrimination provisions have been promulgated by the Governmental contracting

2. The Defense Production Act of 1950, as amended, 50 U.S.C.A.App. § 2061 et seq., was cited as one of the authorities for the order.

3. The provisions stated: "In connection with the performance of work under this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, religion, color, or national origin. The aforesaid provision shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for

training, including apprenticeship. The contractor agrees to post hereafter in conspicuous places, available for employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of the non-discrimination clause.

"The contractor further agrees to insert the foregoing provision in all subcontracts hereunder, except subcontracts for standard commercial supplies or raw materials."

4. The nondiscrimination provisions of the Order are set forth in 41 U.S.C.A.App. (Supp., 1963) § 1–7.101–18.

agencies.[5] Nearly all Government contracts executed after the effective date of Executive Order 10925 contain the nondiscrimination provisions of that Order.[6] One of the regulations states that all Government contracts in effect prior to Executive Order 10925 (March 6, 1961), and not modified by the inclusion of the nondiscrimination provisions of that Order "shall be administered in accordance with the nondiscrimination provisions of the prior applicable Executive Order."

■ Plaintiff asserts that the matter in controversy here arises under the Constitution or laws of the United States within the meaning of 28 U.S.C.A. § 1331(a). This assertion is not frivolous. Under the holding of Bell v. Hood, 327 U.S. 678, 685, 66 S.Ct. 773, 90 L.Ed. 939 (1946), and Wheeldin v. Wheeler, 373 U.S. 647, 649, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), we must conclude that on the face of the complaint the District Court had jurisdiction.

■ Does the matter here arise under the Constitution or laws of the United States within the meaning of 28 U.S.C.A. § 1331(a)? Among other reasons, the Constitution and its amendments were adopted to limit the exercise of certain powers by Governmental officials, both National and State, so that certain individual rights would not be disturbed by them. However, the complaint does not assert any claim against anyone acting under, or color of, Governmental authority, but one against a private corporate employer. Hence the matter in controversy is not one arising under the Constitution.

■ Does it arise under the laws of the United States?[7] Plaintiff maintains that the authority to issue the applicable executive orders in question stems from subsections (a) and (c) of § 205 of the Federal Property and Administrative Services Act of 1949. There are instances when the President issues proclamations and orders, and governmental agencies promulgate rules and regulations, pursuant to a mandate or a delegation of authority from Congress. In such instances the proclamations, orders, rules and regulations have the force and effect of laws.[8] Subsections (a) and (c) of the Federal Property and Administrative Services Act of 1949, 63 Stat. 389, 40 U.S.C.A. § 486(a) and (c) provide:

"(a) The President may prescribe such policies and directives, not inconsistent with the provisions of this chapter [Chapter 10 of Title 40], * * * chapter 4 of Title 41 * * * as he shall deem necessary to effectuate the provisions of said chapters, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder."

"(c) The Administrator shall prescribe such regulations as he deems necessary to effectuate hi.. functions under this chapter [Chapter 10 of Title 40], * * * chapter 4 of Title 41 * * * and the head of each executive agency shall cause to be issued such orders and directives

5. See Federal Procurement Regulations, 24 F.R. 1964 (March 1959), 41 CFR, Rev'd January 1961, § 1–7.101–18; the General Services Administration, 25 F.R. 5575 (June 1960), 41 CFR, Rev'd January 1961, § 5–12.50.

6. In addition to 26 F.R. 1977 (March 1961), these provisions may be found in 41 CFR, Rev'd January 1963, § 1–7.101–18, and 41 U.S.C.A.App. (Supp.1963) § 1–7.101–18.

7. The District Court did not find it necessary to answer this question. In viewing the complaint as stating a cause of action under common-law contract principles and applying the test of Gully v. First National Bank, 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936), it concluded that "the Executive Order does not create a right which is an essential element of plaintiff's cause of action." 215 F.Supp. 729, 731 (E.D.Pa.1963).

8. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); United States v. Gilbertson, 111 F.2d 978, 980 (C.A.7, 1940); Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); Maryland Casualty Co. v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 64 L.Ed. 297 (1920).

as such head deems necessary to carry out such regulations."

Chapter 10 of Title 40 is concerned with the procurement, utilization, management and disposal of property by government agencies. The purpose of Chapter 4 of Title 41 is to facilitate the procurement of property and services for the government by uniform procedures.

Defendant does not contend that the requiring of non-discrimination provisions in government contracts is beyond the power of Congress. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 588, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Nor does it maintain that the executive orders and regulations were issued without statutory authority. In view of the above quoted subsections of § 205 and the declaration of policy by Congress in § 2 of the Defense Production Act of 1950, and its amendments, 50 U.S.C.A. App. § 2062, we have no doubt that the applicable executive orders and regulations have the force of law.[9] See Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); United States v. Excel Packing Co., 210 F.2d 596 (C.A.10 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 28, 99 L.Ed. 664. However, the matter does not end here for we still must determine whether a violation of the non-discrimination provisions by a party, a private corporation, to the contract gives the plaintiff a right to bring a civil action in the Federal courts for damages sustained as a result of that violation. No statute in terms confers a private

remedy. Plainly the executive orders do not expressly provide for one. Nor do they, in our opinion, do so by implication. The history of the executive orders on the subject from 1951 to the present all point to the conclusion that the enforcement of the nondiscrimination provisions in Government contracts has been entrusted to one or more of the Governmental agencies with the assistance of a committee appointed by the President. The only provisions of any order mentioning court proceedings are paragraphs (b) and (c) of § 312 dealing with sanctions and penalties in Executive Order 10925. These paragraphs provide that the contracting agency or the Committee recommend to the Department of Justice that appropriate proceedings "within the limitations of applicable law" be brought against noncomplying contractors and that criminal proceedings be brought against those furnishing false information to a contracting agency or to the Committee. Paragraph (f) of § 312 of the Order states:

"(f) Under rules and regulations prescribed by the committee, each contracting agency shall make reasonable efforts within a reasonable time limitation to secure compliance with the contract provisions of this order *by methods of conference, conciliation, mediation, and persuasion* before proceedings shall be instituted under paragraph (b) of this section, or before a contract shall be terminated in whole or in part under

9. An argument to the contrary, although not advocated by him, is summed up by Robert S. Pasley in an article on "The Nondiscrimination Clause in Government Contracts", 43 Va.Law Rev. 837 (1957). At p. 857 of the article, he states: "Congress has expressly refused to continue the FEPC and has declined to enact anti-discriminatory legislation. For the executive to attempt to reach the same result by indirection, through the Government contract device, is an [invalid] attempt to legislate where Congress has refused to do so."
   In addition, Congress has not directly appropriated any money for carrying out the policies announced in the executive

orders. A report by the Committee on Government Contracts notes that attempts to secure some form of Congressional sanction for the program failed in the 1958–59 session and were defeated at both the regular and special sessions in 1960. See Seventh Annual Report (1961), pp. 6, 9. The Act of May 3, 1945, 59 Stat. 134, 31 U.S.C. § 691, the only legislation specifically cited in Executive Order 10479 as authority for issuing the order, is merely a general appropriation measure for making appropriation to executive departments and agencies available to defray the cost of interdepartmental committees.

paragraph (d) of this section for failure of a contractor or subcontractor to comply with the contract provisions of this order."

Section 307 of this Order in pertinent part provides:

"Each contracting agency shall be primarily responsible for obtaining compliance with the rules, regulations, and orders of the Committee with respect to contracts entered into by such agency * * *. All contracting agencies shall comply with the Committee's rules in discharging their primary responsibility for securing compliance with the provisions of contracts and otherwise with the terms of this Executive order and of the rules, regulations, and orders of the Committee pursuant hereto. * * They are further directed to appoint or designate * * * compliance officers. It shall be the duty of such officers to seek compliance with the objectives of this order *by conference, conciliation, mediation, or persuasion*." (Italics ours)

The regulations of the President's Committee on Equal Employment Opportunity, issued under Executive Order 10925, 26 F.R. 6585 (July 1961), 41 CFR, § 60–1.24(b) (2), state in part:

"If the investigation [made by the contracting agency] indicates the existence of an apparent violation of the nondiscrimination provisions, the matter should be resolved by informal means whenever possible."

When informal means are unsuccessful, 41 CFR, § 60–1.24(b) (3) provides that the appropriate sanction or penalty may

be imposed. However, the intention of the Committee to maintain control over the imposition of such sanctions and penalties is shown by the provision that

"The contracting agency shall not impose any sanction or penalty under Section 312 of the Order, except under subsection (d) of that section relating to contract termination, without prior approval of the Committee * * *."

Further, § 60–1.29 of 41 CFR provides that no case shall be referred to the Department of Justice for legal action without ten days' notice to the contractor "affording him an opportunity to comply with the provisions of the Order * * *.", and that

"In addition, the contracting agency shall make reasonable efforts to persuade the contractor to comply with the Order and to take such corrective action as may be appropriate."

As far as we have been able to ascertain, the Department of Justice has not instituted any proceeding in any court against any noncomplying contractor to enforce the nondiscrimination provisions of a Government contract.

The history of the orders, the rules and regulations made pursuant to them, and the actual practice in the enforcement of the nondiscrimination provisions are all strong persuasive evidence, it seems to us, that court action as a remedy was to be used only as a last resort, and that the threat of a private civil action to deter contractors from failing to comply with the provisions was not contemplated by the orders.[10] As a matter of fact, the

---

10. According to the 1953 Report by the President's Committee on Government Contract Compliance, appointed by Harry S. Truman, that Committee considered but recommended against the possibility of allowing suit by the injured employees and applicants or the insertion in Government contracts of a provision conferring "third-party beneficiary" rights upon them.

An excellent comprehensive Note on State enforcement of antidiscrimination

legislation by administrative commissions, 74 Harv.L.Rev. (1961), states at p. 528:

"Antidiscrimination commissions serve a unique function in the American legal and governmental framework. *It is the basic assumption of the statutes, in some specifically stated, that individuals have a personal civil right to equal treatment. Although most other personal rights are enforceable only by an aggrieved individual's initiation of a court action in which he must bear the cost and inconvenience*

words "breach of the provision" or "unlawful" do not appear in any of them.

We know of no announced overriding federal common law permitting a right of action by an employee against his employer for the latter's failure to comply with the nondiscrimination provision in a government contract.

In any event, §§ 12.806–5 to 12.806–8 of the Armed Services Procurement Regulations, 25 F.R. 14275 (December 31, 1960), 32 CFR, Part 1 to 39 (1961), §§ 12.806–5 to 12.806–8, provided for the filing and processing of complaints for the alleged noncompliance with the provisions of the nondiscrimination clause with the appropriate military department.[11] The President's Committee on Equal Employment Opportunity has promulgated similar regulations. See 26 F.R. 6588–89 (July 1961), 41 CFR, Rev'd January 1963, §§ 60.1.20 to 60.1.27. However, there is no allegation in the complaint that plaintiff has filed a complaint with any Governmental contracting agency, military or civilian, or with the President's Committee. Though it requests damages for an alleged wrongful discharge because of plaintiff's refusal to obey an assertedly discriminatory order by his employer, the complaint does not rule out a challenge to the validity of his discharge and the seeking of reinstatement, with or without back pay under a light duty status, as an alternative item for relief. There has been no showing of impending harm or any inadequacy of the contracting agencies of the President's Committee to give plaintiff adequate relief so as to permit short circuiting the administrative process. Cf. Aircraft & Diesel

Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947), and Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 244, 70 S.Ct. 577, 94 L.Ed. 795 (1950). We believe that the doctrine of "exhaustion of administrative remedies" should at least be applied here, and that plaintiff be required to file a complaint with an appropriate contracting agency or with the President's Committee before being permitted to seek the aid of a Federal district court. However, whether a district court could then entertain jurisdiction is not here decided.

Whether the application of the doctrine of exhaustion of administrative remedies precludes bringing a suit for wrongful discharge or for damages pursuant to a state antidiscrimination statute independent of the provisions of a contract, we need not decide here. However, we may point out that in the case of Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc., 372 U.S. 714, 724, 83 S.Ct. 1022, 10 L.Ed. 2d 84 (1963), although the Supreme Court did not reach the question whether an executive order foreclosed state legislation on the subject of antidiscrimination, the Court did say at page 725 of its Opinion in 372 U.S., at page 1028 of 83 S.Ct., 10 L.Ed.2d 84: "It is impossible for us to believe that the Executive intended for its orders to regulate air carrier discrimination among employees so persuasively as to preempt state legislation intended to accomplish the same purpose."

For the reasons stated, the order of the District Court and the judgment entered thereon granting defendant's motion to dismiss the complaint will be affirmed.

---

of the proceedings, the importance of equal treatment to the general welfare gives the state a special interest in vindicating the rights of complainants. Since the enforcement of an individual's right will have a broad educative effect on the community, the state has also an interest of its own as strong as the

complainant's. By replacing the ineffective civil or criminal suit with administrative investigation and enforcement, it is able to ensure that both objectives are realized."

11. Also see 32 CFR (1963 Supp.) §§ 12.-806–6 to 12.806–8.