LIBERTY MUTUAL INSURANCE COMPANY, Liberty Mutual Fire Insurance Company, and Liberty Mutual Life Assurance Company of Boston, Plaintiffs-Appellants,

v.

Everett FRIEDMAN, Chief of the Insurance Compliance Staff, Social Security Administration; F. Ray Marshall, Secretary of Labor, United States Department of Labor; Weldon J. Rougeau, Director, Office of Federal Contract Compliance Programs; James Cardwell, Commissioner, Social Security Administration, Defendants-Appellees.

No. 80–1078.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1980.

Decided Jan. 9, 1981.

Kalvin M. Grove, Chicago, Ill. (Jeffrey S. Goldman, Martin K. Denis, Fox & Grove, Chicago, Ill., John K. Dane, Boston, Mass., on brief), for appellants.

Joseph Scott, Civ. Div., Dept. of Justice, Washington, D. C. (Carin Clauss, Sol. of Labor, James D. Henry, Associate Sol., Louis G. Ferrand, Jr., Dept. of Labor, Alice Daniel, Asst. Atty. Gen., Washington, D. C., Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., William Kanter, Civ. Div., Dept. of Justice, Washington, D. C., on brief), for appellees.

Joel L. Finger, Barry Asen, Thomas C. Greble, Jackson, Lewis, Schnitzler & Krupman, New York City, on brief for American Ins. Assn., amicus curiae.

Edwin M. Zimmerman, William H. Allen, John B. Jones, Jr., Alex Kozinski, Covington & Burling, Washington, D. C., on brief for Alliance of American Insurers and Nat. Assn. of Independent Insurers, amicus curiae.

Thompson Powers, Martin D. Schneiderman, Christopher T. Lutz, John D. Bates, Steptoe & Johnson, and Douglas S. McDowell, McGuiness & Williams, Washington, D. C., on brief for Equal Employment Advisory Council, amicus curiae.

Before HAYNSWORTH, Chief Judge, and BUTZNER and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Liberty Mutual Insurance Company and two related insurance companies (Liberty) challenge the district court's conclusion that defendant Rougeau [1] validly issued a determination by letter that the companies are government subcontractors and thus subject to the recordkeeping and affirmative action requirements of Executive Order 11,246.[2] We conclude that defendants' action was outside any statutory authorization and reverse.

I

Under § 202 of Executive Order 11,246, as amended, contractors and subcontractors [3] with the government are prohibited

---

1. Defendant Rougeau, director of the Office of Federal Contract Compliance Programs, and the other defendants-appellees are federal government officials assigned responsibility in the Executive Order program.

2. Exec.Order No. 11,246, 3 C.F.R. 339 (1964–1965 Compilation), *as amended by* Exec.Order No. 11,375, 3 C.F.R. 684 (1966–1970 Compilation).

3. Section 202(7) requires the contractor to include the antidiscrimination and affirmative action clauses in all nonexempt subcontracts.

from discriminating in employment on the basis of "race, color, religion, sex, or national origin" and are required to take affirmative action to ensure equal employment opportunity. Section 201 of the Executive Order provides that the Secretary of Labor shall administer and enforce the order and grants rulemaking power to the Secretary. The Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) has promulgated regulations that require government contractors and subcontractors to furnish reports and other information about their affirmative action programs.[4]

Liberty underwrites workers' compensation insurance for many companies that contract with the government. Ordinarily, this type of insurance provides blanket coverage for all employees of the insured company whether or not the employees are performing work under a government contract or subcontract. During the time period involved in this case, Liberty has not written any insurance policies for any federal governmental agency and has not signed any contracts or subcontracts that include the antidiscrimination or affirmative action clauses required to be included in covered contracts by Executive Order 11,246.

In October 1977, defendant Friedman notified Liberty that Liberty was a government subcontractor under the definition found in 41 C.F.R. § 60–1.3 and therefore subject to the requirements of Executive Order 11,246. Section 60–1.3 defines subcontract as:

> any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee):
>
> (1) For the furnishing of supplies or services or for the use of real or personal property, including lease arrangements, which, in whole or in part, is necessary to the performance of any one or more contracts; or
>
> (2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken, or assumed.

Because all states in the United States have enacted workers' compensation laws, and employers, including government contractors, are obligated by statute to provide workers' compensation insurance, defendant determined that Liberty was providing a service necessary to the performance of the federal contract and was, therefore, covered under subsection 1 of the definition above.

Liberty contested the Government's determination that providers of workers' compensation insurance to government contractors are government subcontractors and brought this declaratory judgment action under 28 U.S.C. §§ 2201, 2202. The district court rejected the challenge to defendants' authority to classify Liberty as a subcontractor and entered judgment for defendants.

On this appeal Liberty argues that it is outside the definition of subcontractor found in the regulations; that, if Liberty is found to be within the subcontractor definition, the regulation is either outside the scope of Executive Order 11,246 or beyond the legislative grant of authority of Congress; that, if Executive Order 11,246 covers the insurance policies issued by Liberty, Executive Order 11,246 is an unlawful delegation of legislative authority; and that the Government may not bind Liberty to a contractual obligation to which it did not consent. Because we conclude that, although the regulatory definition of subcontract includes workers' compensation insurance contracts, application of the Executive Order to Liberty is outside the scope of any grant of legislative authority, we need not address Liberty's other contentions.

## II

■ Though we reject it, Liberty's first contention, that it is not a subcontractor within the meaning of the regulations, merits brief discussion. Specifically, the argument—characterized by the district court as an "imaginative, linguistic" one—is that in

---

4. 41 C.F.R. § 60–1.7.

the definition of subcontract set out above the phrase "is necessary" in subsection 1 refers to "agreement." Although employers, including government contractors, must provide workers' compensation insurance, most states allow employers to self-insure. Because self-insurance is an option, an agreement with another company is not necessary to the performance of the government contract. The Government contends in its brief that "is necessary" refers to the phrase "[f]or the furnishing of supplies or services." This construction, of course, would absorb the definition in subsection 2. At oral argument the Government asserted that subsection 1 applied only to the furnishing of *legally* necessary supplies and services. This last construction is apparently the one the Government has used in applying subsection 2 and is reflected in the determination letter sent to Liberty. In that letter the Government stated that Liberty was covered by Executive Order 11,246 because it issues workers' compensation insurance, which all states require employers to provide. According to the Government, then, the furnishing of workers' compensation is legally necessary whether an employer supplies its own insurance or purchases a policy from an insurance company, and Liberty, because it furnishes the legally necessary insurance, is a subcontractor under subsection 1. Although the definition found in the regulations is hardly a model of clarity, the Government's construction is far more reasonable than that urged by Liberty. The difficulty with Liberty's argument that "is necessary" refers to "agreement," as aptly stated by the district court, is that "contractors engage 'subcontractors' to provide supplies or services for economic or other reasons. It is a rare instance in which a primary contractor has no choice but to engage the services of a subcontractor." Under this construction subsection 1 would rarely, if ever, apply.

We conclude, as did the district court, that Liberty's workers' compensation poli-cies issued to government contractors are subcontracts under the regulations.

### III

■ Liberty's second argument, that the broad definition of subcontractor, with its attendant consequences for meeting the recordkeeping and affirmative action requirements of Executive Order 11,246, is outside the scope of the Order or beyond any legislative grant of authority presents a more difficult question.

The history of Executive Order 11,246 is discussed in detail in *Contractors Association v. Secretary of Labor*, 442 F.2d 159, 168–71 (3d Cir. 1971), and need not be recounted here. Executive Order 11,246, as amended, "charge[s] the Secretary of Labor with ensuring that corporations that benefit from government contracts provide equal employment opportunity regardless of race or sex." *Chrysler Corp. v. Brown*, 441 U.S. 281, 286, 99 S.Ct. 1705, 1709, 60 L.Ed.2d 208 (1979) (footnote omitted). Although the Executive Order is written in broad terms, the prohibition against discrimination in employment is clearly intended to cover both government contractors and their subcontractors. Section 202(7) of the Order specifically requires contractors to include in all subcontracts the antidiscrimination, affirmative action, and recordkeeping provisions required by Executive Order 11,246. Subcontract is not defined within the Executive Order, but § 201 provides that the Secretary of Labor "shall adopt such rules and regulations ... as are deemed necessary and appropriate to achieve the purposes" of the Order. Those purposes, as declared by the Supreme Court in *Chrysler*, "are an end to discrimination in employment by the Federal Government and those who deal with the Federal Government." 441 U.S. at 307, 99 S.Ct. at 1720. Because Executive Order 11,246 is clearly intended to cover subcontractors and because the term "subcontractor" has no "single exact meaning,"[5] the Secretary had the power to

5. *MacEvoy Co. v. United States*, 322 U.S. 102, 108, 64 S.Ct. 890, 894, 88 L.Ed. 1163 (1944). In *MacEvoy*, the Supreme Court judicially defined "subcontractor" under the Miller Act, 40 U.S.C. § 270a *et seq.* The Act itself did not define the term, and the Court noted,

define, by regulation, which subcontracts are covered so long as the definition is within the purposes of the Executive Order and the statutory grant of authority. *See Chrysler Corp. v. Brown*, 441 U.S. at 306–07, 99 S.Ct. at 1720. Although the regulation's broad-ranging definition of subcontract is arguably consistent with the purposes of the Executive Order, we conclude that application of the Executive Order to plaintiffs is not reasonably within the contemplation of any statutory grant of authority.

The question before us is not whether Congress could require insurance companies providing workers' compensation insurance to federal contractors to comply with the affirmative action requirements of Executive Order 11,246, the question is "whether or to what extent Congress did grant . . . such authority" to the executive branch of the government. *See NAACP v. Federal Power Commission*, 425 U.S. 662, 665, 96 S.Ct. 1806, 1809, 48 L.Ed.2d 284 (1976). Determining whether defendants have the statutory authorization to require Liberty to comply with Executive Order 11,246 is rendered difficult because "[t]he origins of the congressional authority for Executive Order 11,246 are somewhat obscure and have been roundly debated by commentators and courts." *Chrysler Corp. v. Brown*, 441 U.S. at 304, 99 S.Ct. at 1719.

The *Chrysler* Court acknowledged that several sources of congressional authoriza-

tion have been suggested by lower courts,[6] including the Federal Property and Administrative Services Act of 1949,[7] Titles VI and VII of the Civil Rights Act of 1964,[8] the Equal Employment Opportunity Act of 1972,[9] and "some more general notion that the Executive can impose reasonable contractual requirements in the exercise of its procurement authority." *Id.* at 305–06, 99 S.Ct. at 1720. For the purposes of decision in *Chrysler* the Court was not required to determine the precise source of authority for Executive Order 11,246 because it held that the regulation there being challenged was not authorized by any of the arguable statutory grants of authority. *Id.* at 304–06, 99 S.Ct. at 1719–20.

The challenge in *Chrysler* was to OFCCP rules that provided for disclosure of reports submitted by an employer pursuant to Executive Order 11,246. The Court refused to accord the challenged rule the "force and effect of law" in part because none of the arguable statutory grants of authority contemplated the disclosure rule being challenged. *Id.* at 304–08, 99 S.Ct. at 1719–1721. Although *Chrysler* involved a challenge to a particular aspect of the OFCCP's administration of Executive Order 11,246 instead of a threshold challenge, as here, to the legitimacy of the order's attempted application for any purpose to the challenging employer, we think the method of analysis used in *Chrysler* is equally applicable here, and to that we now turn.[10]

---

In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to a prime contractor. . . . But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen.

*Id.* at 108–09, 64 S.Ct. at 894–5. Because the term is not susceptible to a uniform definition, we do not attempt to state the precise boundaries within which the Secretary may validly require compliance with the Executive Order, but we do note that the Secretary's definition of subcontractor is beyond the scope even of the "broad, generic" sense of the term.

**6.** The Executive Order states that it is promulgated "[u]nder and by virtue of the authority

vested in [the] President of the United States by the Constitution and statutes of the United States. . . ." 3 C.F.R. 339 (1964–1965 Compilation). There is no reference to a specific statutory source.

**7.** 40 U.S.C. § 471 *et seq.*

**8.** 42 U.S.C. §§ 2000d to 2000d–4, 2000e to 2000e–17.

**9.** 42 U.S.C. §§ 2000e, 2000e–1 to –6, –8, –9, –13 to –17.

**10.** In response to Liberty's contention that authorization for the challenged application of Executive Order 11,246 must be found in a particular legislative grant, defendants take the position that "there is no . . . burden on the government" to identify the legislative grant.

## IV

■ A congressional grant of legislative authority need not be specific in order to sustain the validity of regulations promulgated pursuant to the grant, but a court must "reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* at 308, 99 S.Ct. at 1721. Our examination of the possible statutory sources of congressional authorization for Executive Order 11,246 convinces us that none of the statutes reasonably contemplates that Liberty, as a provider of workers' compensation insurance to government contractors, may be required to comply with Executive Order 11,246. We conclude therefore that none of the cited statutes authorize the action taken by defendants.

### A.

First, we consider as a possible source the general procurement power of Congress as delegated to the Executive by the Federal Property and Administrative Services Act. 40 U.S.C. § 471 *et seq.* (The Procurement Act). Congress has said of this Act that its purpose is to provide "an economical and efficient system" for, among other objectives, the procurement of personal property and services. *Id.* § 471. The Act authorizes Executive Orders "necessary to effectuate [its] provisions," *id.* § 486(a), but does not mention employment discrimination. *See also Chrysler Corp. v. Brown,* 441 U.S. at 304 n.34, 99 S.Ct. at 1719 n.34.

Several cases, some specifically relied upon by defendants, arguably support the view that this Act provides the necessary authorization for application of the Order to Liberty. We think that, rightly analyzed, they do not. In *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3 (3d Cir. 1964), the court stated that the delegation to the President in § 486(a) was the statutory authorization for a predecessor of Executive Order 11,246, *id.* at 7–8, but that conclusion was not necessary to the decision in *Farmer.* The court in *Farkas v. Texas Instrument, Inc.,* 375 F.2d 629 (5th Cir. 1967), reached the same conclusion, *id.* at 632 n.1, but that conclusion was also dictum. *See Chrysler Corp. v. Brown,* 441 U.S. at 304 n.34, 99 S.Ct. at 1719 n.34, *citing Contractors Association v. Secretary of Labor,* 442 F.2d at 167.

More apposite, and to be reckoned with, is *Contractors Association* in which the court squarely faced the question whether the Executive may impose the contract terms required by Executive Order 11,246 upon federally assisted state construction contracts. The court noted that neither *Farkas* nor *Farmer* had analyzed the relation between the statutory grant of authority in § 486(a) and the nondiscrimination objectives of the Executive Orders, 442 F.2d at 167; *see Chrysler Corp. v. Brown,* 441 U.S. at 304 n.34, 99 S.Ct. at 1719 n.34, but went on to find that relationship sufficiently established in respect of federally assisted construction projects because of the strong federal interest in ensuring that the cost and progress of these projects were not adversely affected by an artificial restriction of the labor pool caused by discriminatory employment practices. As the court noted, the Executive Order applies to all direct federal procurement contracts but, with respect to federally assisted contracts, extends its coverage to construction contracts only. This choice was significant to the court because it involved the one type of federally assisted contract in which discrimination would be most likely adversely to affect cost and progress of projects. *Id.* at 170. The Government's interest in keep-

Brief for Appellee at 17. Consistent with this position, defendants have declined to stake their claim of authority on any particular statutory or constitutional sources, relying instead on a general contention that "Congress has generally approved of, and given its sanction to, the executive order program . . . ." *Id.* Because we believe that the particular source must be found, our analysis must proceed, as in *Chrysler,* to consider all reasonably arguable sources. These are generally deducible from the authorities relied upon by defendants in their argument addressed to the lack of authorization. Generally, we run the gamut of the possible sources identified in *Chrysler.*

ing costs low and ensuring completion of state construction projects that receive federal assistance was considered identical to the Government's interest with respect to direct procurement contracts. *Id.*

*Contractors Association* thus found in the Procurement Act both a general source of congressional authority for Executive Order 11,246 and a specific source of authority for the particular application there being challenged. Reserving judgment on the first of these, *cf. Cramer v. Virginia Commonwealth Univ.*, 415 F.Supp. 673, 680 (E.D.Va. 1976) (questioning *Contractors Association's* analysis); Note, *Doing Good the Wrong Way: The Case for Delimiting Presidential Power Under Executive Order No. 11,246*, 33 Vand.L.Rev. 921, 931 (1980) (questionable as general source), we conclude that under the test applied in *Contractors Association* there can be found in the Procurement Act no authorization for the specific application being challenged in the instant case.

The key point in *Contractors Association* is its recognition that any application of the Order must be reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement (whether direct or assisted) in order to lie within the statutory grant. This requirement of a reasonably close nexus between the efficiency and economy criteria of the Procurement Act and any exactions imposed upon federal contractors by Executive Orders promulgated under its authority has recently been highlighted by the District of Columbia Circuit in a closely related context. In *AFL–CIO v. Kahn*, 618 F.2d 784 (1979) (en banc), the court upheld as having the force and effect of law the requirement of Executive Order 12,092 that federal contractors certify compliance with voluntary wage and price guidelines established by the Council on Wage and Price Stability. Though, as in *Contractors Association*, the *Kahn* court found the Executive Order's requirements to fall within the statutory authority of the Procurement Act,

the several opinions of the court took great pains to emphasize that the court's holding was rested narrowly upon the manifestly close nexus between the Procurement Act's criteria of efficiency and economy and the Executive Order's predominant objective of containing procurement costs. *Id.* at 792–93 (majority opinion); *id.* at 796–97 (Bazelon, J. concurring); *id.* at 797 (Tamm, J. concurring); *cf. id.* at 797 (MacKinnon, J. dissenting) (no statutory authority for order).

Assuming, without deciding, that the Procurement Act does provide constitutional authorization for some applications of Executive Order 11,246, we conclude that, in any event, the authorization could validly extend no further than to those applications satisfying the nexus test used in *Contractors Association* and *Kahn*. Applying that test here, we are satisfied that it is not met.

In applying the test, it is important first to note a respect in which the record before the *Contractors Association* court differed materially from that developed in this case to show the relationship between Procurement Act criteria and Executive Order application. In *Contractors Association*, but not in the instant case, there were factual findings in the record which tended to show a demonstrable relationship between the two which was not apparent from a consideration alone of the Act and the Order.

Before the plan challenged in *Contractors Association* was implemented, a series of public hearings was held in the targeted area that resulted in administrative findings which reflected serious underrepresentation of minority employees in six trades. The mathematical disparity was found to be caused by exclusionary practices of trade unions rather than any lack of qualified minority applicants in the labor pool. 442 F.2d at 164, 173. These findings buttressed the *Contractors Association* court's conclusion that the Executive was acting to protect the federal government's financial interest in the state projects thereby establishing the sufficiently close nexus sought

by both the *Contractors Association* and *Kahn* courts. *Cf. Fullilove v. Klutznick,* —— U.S. ——, ——, 100 S.Ct. 2758, 2785–90, 65 L.Ed.2d 902 (1980) (Powell, J., concurring: importance of legislative findings of discrimination to sustain Act of Congress mandating affirmative action in federal grants for local public works projects).

By contrast, no such findings were made in the case before us. Liberty is not itself a federal contractor and there is, therefore, no direct connection to federal procurement. Instead, Liberty provides blanket workers' compensation insurance to employers that hold federal contracts. There are no findings that suggest what percentage of the total price of federal contracts may be attributed to the cost of this insurance. Further, there is no suggestion that insurers have practiced the deliberate exclusion of minority employees found to have occurred in *Contractors Association.* The connection between the cost of workers' compensation policies, for which employers purchase a single policy to cover employees working on both federal and nonfederal contracts without distinction between the two, and any increase in the cost of federal contracts that could be attributed to discrimination by these insurers is simply too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives.

Defendants rely upon, and we of course recognize that there are decisions from other courts that can be read to reject the need for any such nexus between Procurement Act economy/efficiency criteria and Executive Order social objectives in order to uphold challenged applications of the Order. *See United States v. New Orleans Public*

*Service, Inc.,* 553 F.2d 459 (5th Cir. 1977), *vacated and remanded on other grounds,* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978); *Rossetti Contracting Co. v. Brennan,* 508 F.2d 1039, 1045 n.18 (7th Cir. 1975); *Northeast Construction Co. v. Romney,* 485 F.2d 752, 760–61 (D.C.Cir.1973). In what could be taken as the most extreme view expressed in these decisions, one characterizes the other two as standing for "the proposition that equal employment goals themselves, reflecting important national policies, validate the use of the procurement power in the context of the [Executive] Order." *New Orleans Public Service,* 553 F.2d at 467. To the extent this quotation rightly characterizes these holdings, and to the extent it reflects a considered rejection of the requirement of nexus between Procurement Act purposes and Executive Order objectives that we read in *Contractors Association* and *Kahn* and that we apply here,[11] we simply disagree. The plain implication of such a rejection would be that regulations promulgated under an Executive Order that traces its lawmaking authority to a particular statute need bear no relation to the purposes of that authorizing statute so long as the regulations bear relation to national policies reflected in other sources—common law, statutory, or constitutional. This would render meaningless the simple, fundamental separation of powers requirement, recently reasserted by the Supreme Court in *Chrysler,* that such an "exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of [legislative] power by the Congress . . . ," 441 U.S. at 302, 99 S.Ct. at 1718, and lie "reasonably within the contemplation of that grant of authority." *Id.* at 306, 99 S.Ct. at 1720.

---

11. On careful analysis, this might be questioned. The discussion of this general proposition in *Northeast,* for example, is technically dicta, since the court there simply assumed the validity of the Executive Order, and the nexus-issue was not directly in contention. *See id.* at 760–61. Furthermore, in all three cases, whatever the course of general discussion in the opinions, there is great likelihood that upon a *Contractors Association*-type analysis, a suffi-

cient efficiency/economy nexus might well have been demonstrable. All three involved construction contractors as to whom the restricted labor pool analysis might well have applied. Certainly in all three such a nexus is more readily surmised from the mere nature of the contracts than could possibly be shown in relation to the insurance "sub-contracts" involved in the instant case.

As indicated, we think that this fundamental requirement dictates application of the sort of nexus test we apply here, and that when applied to the regulations here in question and the Procurement Act it is plain that the former do not lie "reasonably within the contemplation of" the latter.

### B.

We next consider as possible sources of statutory authorization for the Executive Order Titles VI and VII of the Civil Rights Act of 1964. The short answer to this possibility is that neither Title contains any express delegation of substantive lawmaking authority to the President. *Chrysler*, 441 U.S. at 305 n.35, 99 S.Ct. at 1719 n.35.

Indeed, as the Supreme Court pointed out in *Chrysler*, the question of the relationship of these Titles to Executive Order 11,246 has "usually been put in terms of whether Executive Order 11,246 is inconsistent with these titles . . .," 441 U.S. at 305 n.35, 99 S.Ct. at 1719 n.35, rather than in terms of whether the latter provide authorization for the former.

### C.

The final possible source of congressional authorization to be considered is that contended by defendants to have occurred by "ratification" or "negative authorization" of the Executive Order flowing from the rejection in 1972 of several amendments intended to circumscribe the role of the Executive Order program. The argument depends essentially upon the congressional debates surrounding adoption of the Equal Employment Opportunity Act of 1972. 42 U.S.C. §§ 2000e to 2000e–17 (1976). *See Chrysler*, 441 U.S. at 306 n.36, 99 S.Ct. at 1720 n.36; *Legal Aid Society v. Brennan*, 608 F.2d 1319, 1329 n.14 (9th Cir. 1979); *United States v. New Orleans Public Service, Inc.*, 553 F.2d at 467.

Even if "ratification" by such a process might in some circumstances be properly found—a matter of some general dubiety when its potential effect upon the dynamics of the legislative process is carefully considered [12]—we do not think it can properly be found here. The rejection in 1972 of a series of amendments which would have cut back the Executive Order program in existence at that time, cannot fairly be considered to contemplate a grant of authority to the Executive to extend the program to Liberty in 1977.

### V

Defendants acted outside any grant of legislative authority when they sought to impose the requirements of Executive Order 11,246 upon plaintiffs. Without this critical connection to legislative authorization, defendants' action cannot be given effect.[13] The decision of the district court is reversed.

REVERSED.

BUTZNER, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and III of the court's opinion to the extent that they set forth the

---

**12.** *See* Note, *Doing Good the Wrong Way: The Case for Delimiting Presidential Power Under Executive Order No. 11,246*, 33 Vand.L.Rev. 921, 946–47 (1980).

**13.** The possibility that authorization for the Executive Order might be found independently of statutory sources in the "inherent powers" of the President inferable from the general powers conferred directly upon him by article II of the Constitution is completely foreclosed by *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). There the Supreme Court held that the "inher-

ent powers" of the President under his constitutional authority as Commander-in-Chief did not support his executive order directing seizure of the steel mills during the Korean conflict. This was legislative action and in the absence of any delegation of lawmaking power by the Congress, none could be inferred from the President's constitutional powers to see that the laws are faithfully executed. *Id.* at 587, 72 S.Ct. at 866. The same reasoning must apply to the lawmaking power clearly assumed in Executive Order 11,246.

factual and legal background of this case. I also concur in Part II which holds that workmen's compensation policies issued to government contractors are subcontracts within the meaning of the regulations that implement Executive Order 11,246.

I dissent from the conclusion reached in Parts IV and V of the court's opinion holding that there is no congressional authority for imposing the requirements of Executive Order 11,246 on Liberty Mutual Insurance Company.

The reasons for my dissent can be stated briefly. The equal protection component of the fifth amendment bars executive departments and agencies from employment discrimination on account of race, religion, or sex. Implicit in the Procurement Act,* I believe, is authorization for the President to promulgate orders and regulations requiring government contractors and their subcontractors, who are engaged pursuant to the Act, to observe the ban against employment discrimination that the Constitution imposes on the executive branch. The Executive Order and its implementing regulations are a reasonable means for achieving this constitutional and statutory end. They comply with § 486(a) because they are "not inconsistent with the ... Act," and it is evident that the President "deem[s] [them] necessary to effectuate the provisions of [the] Act." Therefore, it seems to me, when Congress authorized executive departments to procure goods and services, it also authorized the President to promulgate such orders and regulations as he deemed necessary to assure the obedience of government contractors and subcontractors to the constitutional restrictions on the powers granted the executive branch. In short, Congress armed the President with sufficient authority to prohibit government contractors from engaging in the discriminatory practices that the Constitution forbids to the government itself.

To buttress my dissent, I rest on the opinion of the district court, *Liberty Mutual Insurance Co. v. Friedman*, 485 F.Supp. 695, 708–16 (D.Md.1979). There the court rejected the arguments that Executive Order 11,246 lacked legislative authority. This decision accords with those of courts of appeals that have examined this subject. *See United States v. New Orleans Public Service, Inc.*, 553 F.2d 459, 465–68 (5th Cir. 1977), *vacated and remanded on other grounds*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978); *Rossetti Contracting Co. v. Brennan*, 508 F.2d 1039, 1045 n.18 (7th Cir. 1975); *Northeast Construction Co. v. Romney*, 485 F.2d 752, 760–61 (D.C.Cir. 1973); *Contractors Association v. Secretary of Labor*, 442 F.2d 159, 166–171 (3d Cir. 1971); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967); *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3, 7–8 (3d Cir. 1964).

Indeed, among the courts of appeals, this court alone impugns the authority of the Secretary, as the President's delegate, to enforce Executive Order 11,246 against a subcontractor. Dissenting, I would affirm the judgment of the district court.

---

* 40 U.S.C. § 486(a) provides:

The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder.